[Civ. No. 1276. Fourth Appellate District.—July 13, 1934.]

HERBERT P. SEARS, Respondent, v. RALEIGH WHISTON, Appellant.

John B. Haas and John D. Home for Appellant.

Brittan & Mack for Respondent.

BARNARD, P. J. — The plaintiff brought this action against the two defendants, who are father and son, to recover a balance claimed to be due upon three claims for labor alleged to have been performed by plaintiff's assignors for and at the request of the defendants. The labor in question was performed in connection with the drilling of an oil well on a lease owned or controlled by the defendant Raleigh Whiston. The defendant H. L. Whiston defaulted and the defendant Raleigh Whiston answered, and the trial proceeded upon the issues thus raised. A number of witnesses testified at the trial that at the time the plaintiff's assignors went to work the defendant H. L. Whiston agreed with them that he would pay them $2 a day in cash as the work progressed and that in the event a producing oil well was brought in they would be paid the balance of the regular wages which Whiston had theretofore been paying. The main contention of the defendant Raleigh Whiston at the trial was that the debt, if any, was that of his son, H. L. Whiston, it being claimed that he had entered into a contract with his son whereby he was to pay the son

$10,000 and the son was to pay for all material and labor used in drilling the well. The court found in all respects in favor of the plaintiff and entered judgment in his favor for $604.37, from which judgment the defendant Raleigh Whiston has appealed.

The first point raised is that a finding to the effect that H. L. Whiston was the agent of R. Whiston and that these services were rendered for the benefit of R. Whiston, is not sustained by the evidence. While both father and son testified to the existence of a contract between them whereby the son was to furnish all labor and material and the father was to pay him $10,000 for drilling the well, their testimony was none too convincing. The father testified that the contract was not in writing; that he did not know when it was made; that no one was present when it was made except himself and his son; that he agreed to pay his son $10,000; that he had paid him in full; that this amount was not all paid direct to his son but part of it was paid for outstanding bills; that he had not figured out what part he had paid in outstanding bills and what part he had paid to his son; that while he did not owe his son anything, the amount he had paid did not amount to exactly $10,000; and that he owned the drilling outfit and other equipment used in drilling this well. The son testified that he was to furnish the labor and material, while his father was to furnish the derrick and other equipment and pay him $10,000 for drilling the well; that he had no credit and the arrangements for securing the material which he had agreed to furnish were in fact made by his father; and that this material was charged to and paid for by his father. His testimony was impeached by evidence of a statement he had previously made, under oath, to the effect that at this time he was working for his father under an arrangement whereby his father paid the living expenses of his family and that he had no source of income from salary or otherwise from this well. There was also evidence that the father paid many of the bills for labor, including what had previously been paid to respondent's assignors; that on at least one occasion he gave instructions to these laborers as to how the work should be done; that he told one of the respondent's assignors to go to the lease and go to work; that he told all of respondent's assignors, as a group, that

if they would wait a few days they would get their money; that at various times, as the work progressed, he paid respondent's assignors the amounts then due them at $2 per day; and that in a telephone conversation at a time when the wages then earned were unpaid he told one of the respondent's assignors the following:

" . . . he told me then that if I was in Los Angeles he would pay me in full; that he had the money in his pocket and if I was going to get so hard about collecting my wages I could get off the lease and stay off the lease. Q. Did he say anything about future employment, or anything of that sort? A. Yes, he said you will never work for me again."

While the evidence is conflicting, the portions to which we have referred, with the reasonable inferences therefrom, is sufficient to support the finding attacked.

A second contention is that each of the respondent's assignors, after a producing well was brought in, signed a receipt acknowledging that he had received from R. Whiston a certain amount, and that these receipts are conclusive against the claims involved in this action. One of these receipts contained the clause "Wages in full on Dowd lease," another, "All labor in full to date on the Dowd lease," and the third, "All labor in full on the Dowd lease." The three receipts were dated September 26, 1932, October 4, 1932, and October 5, 1932, respectively. In each instance the receipt was for the balance of the amount earned by one of the assignors under the $2 per day schedule. It is conceded that a producing well was brought in and that no payment of the balance of the wages furnished has ever been made. There is no pretense that these receipts covered anything other than the $2 per day, which was to be paid in any event. There is some testimony that a producing well was brought in during the latter part of August of that year, but that the same was sanded up and further work was done upon the well in September. Not only is there no evidence that respondent's assignors knew, or should have known, that the well had been completed and was producing at the time the receipts were given, but the appellant himself testified as follows: "Q. When did you finish this well? A. I think it was in September. Q. In 1932? A. Yes. Q. And since that time it has been producing? A. Not all the time. Q. Well the

majority of the time? A. Well, about six weeks it didn't produce anything; the first six weeks.''

It is well settled that a receipt is always subject to explanation and it was a question of fact for the trial court whether the explanation here made was sufficient under the circumstances. It thoroughly appears that at the time these receipts were given they were not intended by either party thereto to cover the claims which are here involved, and we think the testimony and the explanation made is sufficient to sustain the court's finding (*Brown* v. *Crown Gold etc. Co.,* 150 Cal. 376 [89 Pac. 86]).

The appellant next contends that, assuming that his son was his agent, the respondent released him from liability by requesting the clerk to enter the default of the agent, H. L. Whiston. In support thereof the case of *McDevitt* v. *Corriea,* 70 Cal. App. 245 [233 Pac. 381], is cited. It becomes immediately apparent that the facts in the case before us fail to bring it within the rule there laid down. The complaint herein alleged that the services in question were rendered to each of the defendants and at the request of each. The default of H. L. Whiston was entered by the clerk about five months before the case came on for trial. After the trial, and no doubt in view of what was there developed, judgment was entered against Raleigh Whiston and no judgment was entered against H. L. Whiston. Judgment was thus entered against the principal alone and there is small room for contention that any other election was required. A further consideration is that this point was waived by the appellant since the same was not raised in the trial court by demurrer, motion or otherwise (*Klinger* v. *Modesto Fruit Co., Inc.,* 107 Cal. App. 97 [290 Pac. 127]; *Fleming* v. *Dolfin,* 214 Cal. 269 [4 Pac. (2d) 776, 78 A. L. R. 585]; *Craig* v. *Buckley,* 218 Cal. 78 [21 Pac. (2d) 430]).

It is finally urged that there is no specific testimony as to the reasonable value of the services rendered by the respondent's assignors, that the testimony ranges from $4 to $10 per day for different kinds of work, and that in fixing the reasonable value of the services the court arbitrarily fixed the amount at $4.50 per day. It appears from the findings and judgment that the court adopted a wage scale of $4.50 per day and credited the amounts paid on this

sum, giving judgment for the balance. While the complaint alleged the reasonable value of the services and there was proof of an agreement to pay the wage scale previously paid, the variance between the pleading and the proof was not fatal (*Umphray* v. *Hufschmidt*, 73 Cal. App. 140 [238 Pac. 749]). Not only was the agreement to pay the former wage scale some evidence that this scale was the reasonable value of the services, but there is considerable evidence in the record both as to what the former wage scale was and as to what was usually paid for work of this nature. There is considerable evidence that the wage scale formerly paid was $4, $4.50, $5, $5.50, $6, $6.50, $7 and $10 per day for various kinds of work and that respondent's assignors performed several of these kinds of work. At least two witnesses testified that H. L. Whiston paid $4.50 a day, plus transportation, for similar work on previous jobs on which some of these men had worked. H. L. Whiston himself testified that he was or had been paying $4, $4.50 and $5 per day, plus transportation, for this kind of work. While the evidence would have justified a much higher judgment against the appellant, he is in no position to complain in this regard. (*Moore* v. *Borgfeldt*, 96 Cal. App. 306 [273 Pac. 1114].) There is some evidence to justify the exact amount found and it may not be said that this amount was arbitrarily fixed by the court.

The judgment is affirmed.

Jennings, J., concurred.

Marks, J., being absent, did not participate in this opinion.

A petition by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on September 6, 1934.